IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| MORGAN STANLEY SMITH BARNEY LLC, | : | |
| | : | |
| Plaintiff, | : | C.A. No. 2-23-cv-14314-KMM |
| | : | |
| v. | : | |
| | : | |
| TRENT LEYDA, KAY CAMPIONE, and JAMES BEINDORF, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DECLARATION OF TRENT LEYDA

Trent Leyda makes the following Declaration pursuant to 28 U.S.C. § 1746:

1. I have knowledge of all facts contained in this Declaration, and if called upon to testify, would testify truthfully and accurately to the facts as set forth herein.

2. I have had a number of allegations levied against me along with my colleagues by Morgan Stanley, and submit this declaration to address each of them, as well as to provide the assurances required by the Court's ex parte temporary restraining order issued yesterday.

3. I began my career in the financial services industry in 1995 working for a family wealth office, eventually earning my way to becoming head of investments. Since moving to Vero Beach in 2011, I have focused on building a team to become a high-performance family wealth office. From 2009 to 2023 I led the Leyda Group at Morgan Stanley. I have received recognition as a Top 1200 Barron's Advisor and Top Forbes Advisor from 2018 to 2023. I am particularly proud of our team being named as a Forbes Best-In-State Wealth Management Team in 2023.

4. I worked my way up in this industry, and earned an MBA from Pace Lubin School of Business and a Bachelor of Science in International Economics from The State University of New York, both while going to night school and working full time.

5. In preparation for my resignation I intentionally searched for any information or documents that may have been within my possession, custody or control. In the case of hard copy documents, I returned them to Morgan Stanley. In the case of any electronic information, I deleted it so it could not be recovered.

6. This included a search of my home office for any materials or property of Morgan Stanley's which I used to do my job, all of which was returned when I resigned. I deleted any clients I was connected to on LinkedIn prior to my resignation, and likewise searched my cell phone camera roll to ensure I did not have any pictures of any Morgan Stanley information all before my resignation. As of the time of my resignation, I did not retain any ability to access any documents, client statements, reports, or any other items that Morgan Stanley has alleged are part of their "suspicious printing" allegations. Any materials I accessed or printed while at Morgan Stanley were used for appropriate purposes serving clients before I resigned, then left behind at Morgan Stanley either in my CSA Heather's desk as I describe herein, or in the shred bin if our work using the document was done. Indeed, I was obligated to continue serving my clients until the time of my resignation, and did so. The fact that Morgan Stanley now seeks to use my compliance with this duty to suggest I must have been doing something "suspicious" is not only a giant leap of pure speculation, but is also completely untrue.

7. I began the process of deleting client contacts that over the years have been saved in my personal cell phone. I would guess virtually every advisor at Morgan Stanley has client contact information in their cell phones, including the advisors currently calling on the clients we

served. Morgan Stanley cannot credibly deny that they are aware of this practice, and that clients will often reach out to advisors on their cell phones. I was proactive in searching for any such contact information in my personal cell phones and deleting it. While I started this process days in advance of our planned resignation, and I had completed much of these deletions by the time I resigned, I cannot say that I had 100% completed this task before my resignation. This is because we had to resign a day earlier than planned due to circumstances outside of our control. With this unexpected change to our timeline, in an abundance of caution, I did purge additional contacts out of what had been a sea of more than 1000 contacts in my cell phone on the day of our resignations, following the submission of our letters of resignation. That final review was intended to be completed that night prior to resignation before our timeline changed. However, while the actual deletions occurred shortly after rather than before my resignation, I neither accessed nor used that information in the window between my resignation and when I completed all deletions. Some deletions I was making at that point were just first names. I was not even sure who they were, but I nonetheless erred on the side of deletion. This is the only information at all that I had, and did not use it in any manner subsequent to my resignation. I proactively and promptly deleted it, and did so on our day of resignation, and before Morgan Stanley counsel transmitted even its first letter to us on Friday, October 6th, following our resignations. Through our counsel, we did promptly respond to Morgan Stanley's request and confirm in writing that we did not have any Morgan Stanley confidential information, and I did not have any client related information other than that which had been supplied by clients to me, for example, via inbound calls from clients following resignation, or contact information we had located through publicly available sources. We have that documentation, and look forward to sharing it with

Morgan Stanley. Further, prior to the filing of Morgan Stanley's motion before the court my counsel specifically disclosed this to Morgan Stanley's counsel.

8. Further, we have documented every announcement of our resignation that we have made, as well as every call or meeting requested by clients following that announcement, as well as where their contact information came from – and none of this information came from Morgan Stanley. Either we received an inbound call from the client or we found their information through publicly available sources, as will be fully borne out in the full arbitration of this matter. Attached as Exhibit B is a client acknowledgment executed by any client that requests to continue working with us. We look forward to sharing all of these with Morgan Stanley though their allegations against us do not point to a single instance of alleged solicitation of a client. These acknowledgments signed by clients are entirely consistent with the fact that clients were not solicited. But some have in fact made the decision, as is their right, to continue working with me and our team as their advisors. As set forth below, FINRA rules protect that right, and to this end, Morgan Stanley is supposed to be providing clients who ask for our contact information with that information, though many advisors are denying they have that information. This is of course untrue, as seen by my letter of resignation attached. This is a blatant violation of Morgan Stanley's obligations, and is a clear and intentional tactic to mislead clients and cause obfuscation concerning our whereabouts.

9. Morgan Stanley has made accusations that we must have done something wrong because they "could locate hardly any client files or documents. This would include any 'pending files' pertaining to pending securities transactions." Our mantra as a team, and mine personally is "deal with it, shred it, or scan it in." I conducted myself in the regular course of business that way up until the time of my resignation, and Morgan Stanley's files will reflect

that. To the extent I may have had any lingering items to address at the end of a day, my habit was to give those items and related paperwork to our client service associate Heather to lock in her drawer. There may still be things there, but if it not, it has been dealt with, placed in the shred bin, or scanned in.

10. For roughly the last five years we shared with Morgan Stanley's internal auditors that our team had a policy to either deal with, destroy or scan in dealing with paperwork. We always received positive feedback from the firm for this practice, which we consistently used up until the time of our resignations.

11. My colleagues and I have been accused of "very suspicious" printing activity in the days leading up to our resignations. I continued to serve the needs of clients up until the time I resigned. While Morgan Stanley's allegations in this regard are quite general, to the extent they are characterizing any document I printed as "suspicious" I can assure this Court that every document I utilized, whether printed or electronic form up until the time of my resignation was in connection with work I was performing for a client. I retained none of it after my resignation.

12. Morgan Stanley alleges that prior to leaving the firm someone on our team printed out an account statement for a client maintaining over $15 million in assets with Morgan Stanley and detailed holdings information for another client maintaining over $100 million in assets with Morgan Stanley. While I believe I can guess who these clients are they are referring to, they have not been identified by Morgan Stanley. For one of these clients, we were in the process of consolidating some accounts, and taking as much in some realized losses as possible to offset a gain. We had conferred with the client's accountant who agreed we should harvest losses. We did this using the client's statement, working through position by position, then account by account, as it was easier to do so using a hard copy document. This was undertaken in the usual

course of business, and related instructions will be in a Leyda Support email chain.  I shredded the paper statement the same day we completed this work.

13. I believe the $100 million dollar report Morgan Stanley relies upon to support its suspicions was a custom report for that client that we run every month.  This report is presented to Jonathan Nowak, Morgan Stanley's Complex Risk Officer on a monthly basis.  He routinely reviewed these reports, then stamped them "approved" so we could send the approved report to the client. We undertook this same process for the same two clients every month for more than three years.  There is nothing new or different about this activity, and it had nothing to do with our contemplated resignations.  All of these reports are in our team's shared drive and I did not retain anything, nor am I aware of anyone on our team retaining anything. This again is all documented in Morgan Stanley's systems, and completely undermines their request to the Court here.

14. Pursuant to the Order of the Court dated October 17, 2023 I hereby confirm that I have no Records or Information, in any form, that were retained from Morgan Stanley.  As such, I have nothing to return to Morgan Stanley. The only records I destroyed and deleted since my resignation were the remaining cell phone records in my personal cell phone that I identified above, and that not only were promptly and proactively destroyed, but were not used for any purpose from the time of my resignation prior to that deletion.  I destroyed these materials on my day of resignation, following our expedited resignation, and as a result have nothing to identify as such.  This was all before we heard from Morgan Stanley for the first time the day after our resignations.

15. Morgan Stanley accuses me of soliciting clients, including those that I served pursuant to the Former Advisor Program Active Advisor Agreements (the "FAP Agreements"),

which they identify in the Declaration of Samantha Woggon in support of their motion for a temporary restraining order. I have not only not solicited any of these clients, I have not even been in contact at all with any of them.

16.     I have not solicited any clients at all. As is customary in the financial services industry, and indeed, consistent with the longstanding practice acknowledged by Morgan Stanley as acceptable when it hires financial advisors from its competitors, I made an announcement to clients I served of my new contact information. Morgan Stanley does not allege that all contact is a solicitation, and further must acknowledge in its own practices when it hires an advisor from a competitor who has non-solicitation restrictions such as mine here, that a single announcement of contact information to clients is not solicitation and does not constitute a violation of that provision. I did no more than that.

17.     Indeed, many of the clients I have spoken with since my resignation I have not even initiated contact with. Those clients have reached out to me, distressed by what they are being told by Morgan Stanley as it defames me and my colleagues in the process of trying to scare clients into keeping their accounts with Morgan Stanley.

18.     Morgan Stanley claims to this Court (Woggon Declaration par. 26) that "if our clients are diverted away, we will lose these relationships for years into the future." But, in fact, Morgan Stanley's regulator, Financial Industry Regulatory Authority ("FINRA"), has implemented rules which require that clients have the freedom of choice to work with any advisor they wish, and clients are free to leave, including to follow a departed advisor such as myself, if they wish to continue to work with me. FINRA Rule 2140 expressly prohibits Morgan Stanley from taking any steps to interfere with the transfer of customer accounts in the context of employment disputes such as this one. According to the Rule, "Prohibited interference includes,

but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account." (FINRA Rule 2140)  This rule implicitly recognizes that client freedom of choice matters, and clients may choose to continue to work with the financial advisor they have come to know and trust, sometimes over years, even decades long relationships, and just because they choose to do so does not mean they were solicited.

19. FINRA has further protected clients' right to choose their own advisor issuing its Regulatory Notice 19-10 in April, 2019.  By this notice FINRA issued its specific "Guidance on Customer Communications Related to Departing Registered Representatives."  FINRA states that it "has consistently sought to ensure that customers can make a timely and informed choice about where to maintain their assets when their registered representative leaves a member firm" such as Morgan Stanley.  "Accordingly, FINRA expects that… the firm should provide customers with timely and complete answers, if known, when the customer asks questions about a departing registered representative."  FINRA specifically states a member firm such as Morgan Stanley "should communicate *clearly, and without obfuscation*, when asked questions by customers about the departing registered representative."  Further, "when asked by a customer… provided that the registered representative has consented to disclosure of his or her contact information to customers, providing reasonable contact information, such as phone number, email address or mailing address, of the departing representative."  FINRA further requires that "as with all communications with customers, information provided by the member firm about the departing registered representative must be fair, balanced, and not misleading."

20. Morgan Stanley has repeatedly failed and refused to comply with its obligations in this regard to protect client freedom of choice. Instead it has misled clients by leading them to

believe my colleagues and I had not only left Morgan Stanley but had picked up and left the State of Florida. Morgan Stanley has clearly defamed me and my colleagues calling our honesty and integrity into doubt, by among other things, falsely telling clients "the team is gone but now your money is safe." Another client was led to believe that I had actually died, not that I resigned.

21. Some of the elderly clients we served have been told by advisors in our former complex at Morgan Stanley that we must be chaotic, and would not have the ability to work with them at this time. They must have known at the time of those statements that they were untrue because upon information and belief other clients had already informed Morgan Stanley we were able to work with them and they had decided to continue their longstanding relationship with us.

22. Clients have repeatedly reported that they have expressly asked for our contact information and have been told by some Morgan Stanley advisors they have "no idea" where we went. My colleagues and I each used the same letter of resignation and not only provided our contact information, but also gave express permission for this information to be shared with clients pursuant to the Notice 19-10 above. A copy of my letter of resignation is attached as Exhibit A. Yet there are advisors and senior level managers of the Morgan Stanley complex lying to clients who ask for this information, telling clients they had no idea where we were.

23. While my colleagues and I have been accused of telling clients there is no one left in the Vero Beach office to serve them, that advisors would need to fly in from New York to serve them, or suggesting that I was the manager of that office, I have never said any of these things. I was a Managing Director at Morgan Stanley, and I was head of the Leyda Group prior to our resignation. I have not represented anything to the contrary, and there would be no benefit to doing so. Further, we had great respect for our local manager, and on our day of resignations,

I along with my colleagues Kay Campione and Jim Beindorf hugged our local manager as we departed the office for the last time.  Since our departures, we have encouraged some clients who have asked for a contact at Morgan Stanley to call our former manager.  If it were true that I or any of my colleagues were telling clients that I managed the Vero Beach office, it would make no sense whatsoever for us to be referring clients to and providing them with contact information for our long time manager.

24.     Regarding the statements criticizing the Vero Beach advisors that remain there, it seems that the statements complained of by Morgan Stanley are actually coming from *current Morgan Stanley advisors* competing to win the business of the clients we served.  Morgan Stanley seems to have distributed our clients across our former complex which spans Melbourne, Florida to Boca Raton.  If the accounts are over $10 million, Morgan Stanley appears to have given them to another office besides our former Vero Beach office.  A number of clients have reported to my colleagues and me that these advisors who are trying to retain their accounts have told them "there is no one in the Vero Beach office of our caliber," and similar statements that they are far superior advisors and will fly in team members from New York, Washington DC and Chicago to meet with these clients.  It is not us making these statements - - it is Morgan Stanley's own advisors trying to retain the clients we served, and apparently as part of their effort to convince clients that they should not worry that their account has been reassigned by Morgan Stanley from the Vero Beach office to an office or advisors hours away from them.  But again, the statements in this vein are not coming from me, clients have reported these statements *to us* as having been made by *current* Morgan Stanley employees.   Clients have specifically identified advisors in Chicago who have offered to fly in to see clients formerly served by our team, and holding themselves out as uniquely qualified and better prepared than a local advisor to serve

their needs as clients with ultra high net worth. Clients report that other advisors located hours away from them in other parts of Florida have offered to make the drive in to see them. All of these existing Morgan Stanley advisors are laying bare that they are not local to these clients. Those statements cannot be attributed to me, or anyone on my team. These advisors are doing that all by themselves.

25. Morgan Stanley swiftly sought to communicate and retain clients who might make the choice to continue to work with me and my colleagues as their long time trusted advisors, as is their right to do so. The firm seemingly reassigned the clients we served across the entire complex, and clients were often learning for the first time from Morgan Stanley that I and my teammates had resigned. I have not solicited any clients, and in fact have fielded a large number of inbound calls from clients, driven by the aggressive effort of the firm to get to clients, calling them deep into the night, some clients reported receiving calls at 10:00 at night from Morgan Stanley.

26. Thank you for the opportunity to submit this information to the Court.

I declare under penalty of perjury that the foregoing is true and correct.

_/s/ Trent Leyda_
Trent Leyda

Dated: October 18, 2023

# EXHIBIT A

October 5, 2023

Vincent Celano
Morgan Stanley
3525 Ocean Drive
Vero Beach, FL  32963

RE:     Resignation of Trent Leyda

Dear Mr. Celano:

Pursuant to the firm's policies and procedures, I hereby terminate my employment with Morgan Stanley, effective immediately.

Should any clients inquire as to my whereabouts, I request that you furnish them with my contact information. Of course, if any service-related issues arise that I may be able to be of assistance, you may also use this information to contact me.  My contact information will be:

> 3111 Cardinal Drive, Suite 2 West
> Vero Beach, FL  32963
> Tel.: (772) 316-1271

I am providing my contact information, consistent with FINRA Regulatory Notice 19-10, issued on April 5, 2019, so that Morgan Stanley may instruct its representatives to provide this information in response to client questions concerning my departure from the firm.

In anticipation of my resignation, I have performed a good faith search for any property belonging to Morgan Stanley and have returned that property.  I have left my company-issued ~~credit card~~, mobile phone, ~~key fob~~, and keys in my office.

*T.L*           *T.L*

Although I do not anticipate any difficulties, if there are any legal matters that require my attention, you are directed to contact my attorneys directly using the following information:

> Sharron E. Ash, Esq.
> Hamburger Law Firm, LLC
> 228 Park Ave S, PMB 51917
> New York, New York 10003-1502
> Tel.: (201) 705-1227

Upon filing a Form U5 evidencing my voluntary termination, please forward a copy to my address of record. I look forward to an amicable separation and an ongoing professional relationship with Morgan Stanley.

*[signature] Oct 5, 2023*
*Trent Leyda*

# EXHIBIT B

**Acknowledgment of Non-Solicitation:**

I acknowledge and verify that I have asked to become a client of THELG, LLC dba SpirePoint Private Client ("SpirePoint") because of my previous relationship with Trent Leyda, Kay Campione and Jim Beindorf and my continued desire to work with them. I sought information from Trent, Kay and Jim after I learned they had resigned from Morgan Stanley.

In no way or manner was this decision the result of a direct or indirect solicitation by Trent, Kay or Jim or any individuals acting in concert with them. I have requested the paperwork required to move my accounts from Morgan Stanley and have asked Trent, Kay and Jim as representatives of SpirePoint, to oversee and manage my investment assets, and request that Morgan Stanley promptly process my account transfer paperwork when presented.

Dated: _____

Name: _____

Signature: _____